# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARBARA A. BAUM,** | : | CIVIL ACTION NO. 2:16-CV-623 |
| Plaintiff | : | (Chief Judge Conner) |
| v. | : | |
| **METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY, t/d/b/a METLIFE AUTO & HOME,** | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Barbara Baum ("Baum") is a tetraplegic who was hit by an underinsured motorist while operating her wheelchair in a parking lot. Baum filed an underinsured motorist claim ("UIM") with her insurer, defendant Metropolitan Property & Casualty Insurance Company ("MetLife"), for damages she claims she is "legally entitled" to as a result of the accident. Baum argues that MetLife reviewed her claim in bad faith, in violation of 42 PA. CONS. STAT. § 8371, and breached her insurance policy. (Doc. 95). MetLife moves for summary judgment on both counts under Federal Rule of Civil Procedure 56. (Docs. 89, 91). We will grant in part and deny in part MetLife's motion for summary judgment.

I. **Factual Background & Procedural History**[1]

A. **Factual Background**

Barbara Baum is a tetraplegic and a Pennsylvania resident who used a wheelchair for mobility before the incident underlying this litigation. (Doc. 9 ¶¶ 1-2; Doc 20 ¶¶ 1-2). On January 31, 2014, a car driven by Leanne Diamond ("Diamond") struck Baum as she exited a Target department store and headed toward her own car in the parking lot. (Doc. 102 ¶ 1). Baum was thrown from her wheelchair and fractured her fourth and fifth metatarsals in her right foot and the second and fifth metatarsals in her left foot. (Id. ¶ 2). Baum claims that, as a result of the accident, she has suffered from exacerbated episodes of autonomic dysreflexia ("AD"). (Doc. 95 at 8; see also Doc. 105-8, Andrzejczyk Dep. 78:7-79:2).[2]

Baum has a long and well-documented history of medical treatment. (See, e.g., Docs. 103-2, 103-3, 103-4, 103-7, 105-1, 105-2, 105-3, 105-6). Of unique

---

[1] Local Rule 56 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported by a "separately filed concise statement setting forth the facts essential for the Court to decide the motion for summary judgment, which the moving party contends are undisputed and material." LOCAL RULE OF COURT 56(B)(1). A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial. LOCAL RULE OF COURT 56(C)(1)(a)-(b). The opposing party may also "set[] forth in separately numbered paragraphs any other material facts that are allegedly at issue." LOCAL RULE OF COURT 56(C)(1)(c). Unless otherwise noted, the factual background herein derives from the parties' Local Rule 56 statements of material facts. (See Docs. 102, 103, 104, 105, 106). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[2] Deposition transcripts or portions thereof have been filed by the parties at separate docket entries. We will cite the full deposition transcripts only, using the convention "[Name] Dep.," without repeating the docket entry citations *passim*.

2

importance here is Baum's preexisting diagnosis of AD, which she received after she suffered a spinal cord injury in an unrelated automobile accident in 1974. (Doc. 102 ¶ 4; Doc. 103-4 at 1; see also Doc. 105-6 at 4).[3] The parties dispute whether Baum's exacerbated AD symptoms are a product of the January 31, 2014 accident or a continuation of Baum's preexisting condition. (Doc. 104 ¶¶ 2, 3, 18-20, 25, 26; Doc. 106 ¶¶ 29-33). Baum claims she suffered few AD episodes before the accident but has suffered from exponentially more since. (See, e.g., Doc. 95 at 8). MetLife argues that Baum's assertion is not adequately supported by objective medical evidence. (See, e.g., Doc. 106 ¶¶ 27, 29, 30).

Baum filed a claim with Diamond's insurance company, State Farm, after the accident. (Doc. 9 ¶ 14; Doc 20 ¶ 14). State Farm offered Baum $50,000—the limit on Diamond's policy—for her injuries resulting from the accident. (Doc. 9 ¶ 15; Doc. 20

---

[3] The parties have not offered information about AD in their statements of material fact. The court takes judicial notice of the National Institute of Health's description. See FED. R. CIV. P. 201(b)-(c). AD is a rare disease with life-altering implications. See KATHRIN J. ALLEN, ET AL., AUTONOMIC DYSREFLEXIA (2019), https://www.ncbi.nlm.nih.gov/books/NBK482434/. AD usually emerges after a spinal cord injury above the T6 level. See id. "Dysregulation of the autonomic nervous system leads to an uncoordinated autonomic response that may result in a potentially life-threatening hypertensive episode when there is a noxious stimulus below the level of the spinal cord injury." Id. Those with AD have an increased risk of stroke and AD can occur "up to 40 times per day." Id.

¶ 15). On November 21, 2014, Baum submitted a UIM claim to MetLife for $325,000. (Doc. 105-11 at 1; Doc. 9 ¶ 18; Doc. 20 ¶ 18). Baum's UIM policy provides:

> We will pay compensatory damages which an insured is
> legally entitled to recover from the owner or operator of
> an underinsured motor vehicle for BI:
>     A. sustained by an insured; and
>     B. caused by an accident arising out of
> owning, maintaining, or the use of an
> underinsured motor vehicle.

(Doc. 102 ¶ 10). The policy limit is $1,000,000. (Doc. 104 ¶ 37). On December 11, 2014, MetLife offered Baum $20,000 for full settlement of her claim. (Doc. 9 ¶ 20; Doc. 20 ¶ 20). Baum declined MetLife's offer. (Doc. 105-17).

MetLife started its investigation shortly after Baum submitted her UIM claim, employing senior claims adjuster Ceenelle Johnson-Sanders ("Johnson-Sanders") to review Baum's case. (See Doc. 105-7, Johnson-Sanders Dep. 20:10-13, 28:25-29:5). Johnson-Sanders has been a claims adjuster for several years but does not have a medical degree. (Id. at 8:9-9:11). MetLife also employed a claims medical consultant, nurse Ruth Rappaport ("Rappaport"), to assist Johnson-Sanders with her review of Baum's medical condition and to offer alternative options for investigating medical conditions if needed. (Id. at 47:24-48:11; Doc. 105-10, Rappaport Dep. 72:7-78:3). Neither Johnson-Sanders nor Rappaport had experience evaluating claims involving AD before Baum's case. (See Johnson-Sanders Dep. 160:9-15; Rappaport Dep. 81:3-7).

As part of her evaluation, Johnson-Sanders reviewed Baum's medical records, (Johnson-Sanders Dep. 101:20-22), used Rappaport's expertise in reviewing Baum's records, (see Doc. 104 ¶¶ 61-62; Johnson-Sanders Dep. 157:6-22), and

4

reviewed a narrative report from Baum's doctor, Dr. Amanda Harrington ("Dr. Harrington"), (see Johnson-Sanders Dep. 155:11-159:2; see also Doc. 102 ¶¶ 18-19; Doc. 104 ¶¶ 18-19). Johnson-Sanders testified that she considered Baum's medical records and Dr. Harrington's narrative report. (Johnson-Sanders Dep. 157:14-22, 198:9-16). Still, the parties dispute how much Dr. Harrington's report influenced MetLife's decision to reject Baum's settlement demand and challenge her damages figure. (See, e.g., Doc. 102 ¶¶ 18-19; Doc. 104 ¶¶ 18-19).

Dr. Harrington began treating Baum in February 2014, ten days after the accident. (Doc. 102 ¶ 6). Dr. Harrington is a board-certified physiatrist, a professor at the University of Pittsburgh, and the Director of the Spinal Cord Injury Services group at the University of Pittsburgh Medical Center. (Doc. 105-12 at 1). As part of her consultation, Dr. Harrington drafted a narrative report summarizing Baum's previous diagnoses, her understanding of the January 31, 2014 accident, her recommended treatment, and her medical opinion on the severity and cause of Baum's symptoms. (Doc. 105-12 at 4-10). Dr. Harrington's report concluded:

> In Ms. Baum's case, she only had occasional episodes of autonomic dysreflexia in the years following her initial spinal cord injury in 1974. However, since the accident occurring January 31, 2014, she has had increasing intermittent episodes of autonomic dysreflexia. It is likely that both the edema, increase in spasticity, and increased episodes of autonomic dysreflexia are secondary to the foot fractures. I had initially hoped that as she healed and her pain was controlled her problems with improve; however, since it has been 1 year since her accident and these problems are not resolving, I am concerned that this now may be her new normal. It is with a reasonable degree of medical certainty that the foot fractures were the direct cause of the secondary effects of edema, spasticity, and autonomic dysreflexia, and I am concerned

5

> that she may now have chronic swelling, increase in her spasticity and increase in frequency of her episodes of autonomic dysreflexia for the duration of her life.

(Doc. 105-12 at 9).

As part of her investigation, Johnson-Sanders never obtained a statement under oath from Baum. (Doc. 104 ¶ 48). Johnson-Sanders also did not arrange for an independent medical review ("IMR") of Baum's records or an independent medical examination ("IME") of Baum herself, despite a March 2015 suggestion from Rappaport that Johnson-Sanders "consider obtaining an IME spinal cord injury specialist for further comment." (Doc. 104 ¶¶ 51-54; Doc. 105-6 at 46). Johnson-Sanders could have pursued an IME to obtain additional medical opinions on Baum's condition. (See Doc. 104 ¶¶ 46, 51-54; see also Andrzejczyk Dep. 67:1-4). Johnson-Sanders testified that she in fact asked Baum's attorney if Baum would undergo an IME. (Johnson-Sanders Dep. 101:3-104:13). Her claim is contradicted by testimony from Baum's attorney and Johnson-Sanders's supervisor, and her purported IME request is not documented in the MetLife claims file. (See Doc. 105-9, Glassmith Dep. 38:9-40:11; Andrzejczyk Dep. 83:14-20).

By May 28, 2015, MetLife had obtained the final set of Baum's medical records. (See Docs. 105-14, 105-15; see also Doc. 104 ¶¶ 74-75; Doc. 106 ¶¶ 74-75). On July 1, 2015, Baum demanded a "legitimate offer" from MetLife, threatening to sue if no offer was made by July 13, 2015. (Doc. 105-17). On July 10, 2015, MetLife offered Baum $25,000 for full settlement of her claim. (Doc. 9 ¶ 30; Doc. 20 ¶ 30). The parties ceased contact on December 11, 2015, without coming to a settlement

6

agreement. (Doc. 9 ¶¶ 31-32; Doc. 20 ¶¶ 31-32). On April 25, 2016, Baum sued MetLife in the Allegheny County Court of Common Pleas. (Doc. 1-2).

After litigation began, MetLife hired Dr. James Cosgrove ("Dr. Cosgrove") to perform an IME. (Doc. 104 ¶ 78). Dr. Cosgrove evaluated Baum on July 24, 2017 and completed a corresponding report on February 21, 2018. (See Doc. 103-7). Cosgrove found:

> Given that the fractures have gone on[ ]to heal uneventfully, persistent exacerbation of spasticity and dysreflexia is unlikely. … Furthermore, there has been no significant change in medication use when comparing pre- to post-injury medication use. … There is no clear objective difference noted from a neurologic or musculoskeletal standpoint when comparing pre- to post-accident status. There have been no fulminate episodes of autonomic dysreflexia and no evidence of acute medical management or hospitalization.

(Id. at 10-11). In sum, Dr. Cosgrove concluded that the January 31, 2014 accident did not cause Baum's exacerbated AD symptoms. (See id. at 9-11).

### B. Procedural History

Baum sued MetLife in the Allegheny County Court of Common Pleas alleging breach of contract and bad faith in violation of 42 PA. CONS. STAT. § 8371. MetLife removed the case to this court. Baum then filed an amended complaint, which MetLife moved to dismiss. Judge Conti denied MetLife's motion at a September 19, 2016 hearing, and MetLife filed its answer. MetLife also moved to join three nonparties affiliated with the Target parking lot where the accident occurred. Judge Conti denied that motion but requested supplemental briefing on whether the nonparties are joint tortfeasors who should be included on the verdict slip.

After the case was reassigned, we denied MetLife's initial motion and its later motion for reconsideration on the joint tortfeasor issue. MetLife now moves for summary judgment. Briefing is complete and the motion is ripe for disposition.

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

MetLife moves for summary judgment as to both of Baum's claims: statutory bad faith and breach of contract. (Doc. 89). We begin our analysis with the first.

### A. Statutory Bad Faith

Baum claims that MetLife unlawfully acted in bad faith in evaluating and reviewing her claim. (Doc. 95 at 6-14). MetLife counters that Baum has not offered clear and convincing evidence that its investigation or its refusal to accept her settlement demands lacked a rational basis. (Doc. 91 at 8).

We start with the statute. Pennsylvania's bad-faith law provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. § 8371. The insured can show bad faith by offering clear and convincing evidence that the insurer: (1) "did not have a reasonable basis for denying benefits under the policy"; and (2) "knew of or recklessly disregarded its lack of reasonable basis in denying the claim." Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 179 (3d Cir. 2011) (quoting Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994)); see also Rancosky v. Wash. Nat'l Ins. Co., 170 A.3d 364, 377 (Pa. 2017).

Bad faith is "any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent." Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 523 (3d Cir. 2012) (quoting Terletsky, 649 A.2d at 688). Bad faith requires more than "mere negligence or bad judgment." Id. (quoting Frog, Switch

9

& Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 751 n.9 (3d Cir. 1999)). The insured must offer evidence "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." Amica Mut. Ins. Co., 656 F.3d at 179 (citation omitted).

To defeat a bad-faith claim, the insurer need only show that it had a "reasonable basis" for denying the insured's claim or refusing to settle. See Post, 691 F.3d at 522 (quoting Amica Mut. Ins. Co., 656 F.3d at 179). The insurer need not show that its conclusions or investigatory methods were "flawless." Turner v. State Farm Fire & Cas. Co., 260 F. Supp. 3d 419, 425 (M.D. Pa. 2017) (citing Krisa v. Equitable Life Assurance Society, 113 F. Supp. 2d 694, 704 (M.D. Pa. 2000)). But it "must show that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action." Id.; see also 40 PA. STAT. AND CONS. STAT. ANN. § 1171.5(10). MetLife cannot do so.

### 1. *Independent Medical Examination*

Baum argues that MetLife acted in bad faith when it failed to obtain a pre-litigation IME or a statement under oath. (Doc. 95 at 10). In response, MetLife effectively says the failure to perform an IME is harmless error because Dr. Cosgrove performed an IME after litigation began and his findings aligned with MetLife's pre-IME conclusions. (Doc. 91 at 14; Doc. 96 at 6).

To begin with, "the insurance company must conduct a meaningful investigation, which may include an in-person interview, examination under oath, medical authorizations, and/or independent medical examinations." Mineo v. Geico, No. 12-1547, 2014 WL 3450820, at *6 (W.D. Pa. July 15, 2014) (citing Hollock v.

10

Erie Ins. Exch., 54 Pa. D. & C.4th 449, 513 (Pa. Ct. Com. Pl. 2002); Bonenberger v. Nationwide Mut. Ins. Co., 791 A.2d 378, 379-81 (Pa. Super. Ct. 2002)). Both federal and Pennsylvania courts have indicated that failure to timely obtain an IME is probative of bad faith. See, e.g., Parisi v. State Farm Mut. Auto. Ins. Co., No. 3:16-179, 2018 WL 2107774, at *14 (W.D. Pa. May 7, 2018); Bonenberger, 791 A.2d at 379-81; Hollock, 54 Pa. D. & C.4th at 513. Common sense dictates that an IME is particularly insightful when the insured suffers from a rare, complex, and unique preexisting condition.

MetLife did not obtain a pre-suit IME of Baum despite her long medical history and Dr. Harrington's report contradicting Johnson-Sanders' conclusions. MetLife forewent an IME in the face of Rappaport's recommendation, the claims medical consultant assigned to Baum's case. (See Doc. 105-6 at 46). It is concerning that an adjuster with no medical training, tasked with evaluating a unique medical condition for an insured with a unique medical history, ignored a medical professional's recommendation. See Mineo, 2014 WL 3450820, at *6. Whether this decision was made in bad faith is an issue of genuine dispute, but Baum has put forth enough clear and convincing evidence that MetLife's decision stemmed from recklessness rather than mere negligence.

We also note that record evidence reveals an apparent attempt of self-preservation by Johnson-Sanders. At her deposition, Johnson-Sanders testified that she requested an IME during a conversation with Baum's counsel but did not recall documenting her request. (Johnson-Sanders Dep. 101:3-104:13). The deposition testimony of Baum's counsel suggests otherwise. (Glassmith Dep. 38:9-

11

40:11). And Johnson-Sanders's supervisor testified that this sort of request should have been documented had it occurred. (Andrzejczyk Dep. 83:14-20). Whether Johnson-Sanders sought an IME is a material fact that the parties fiercely dispute and goes directly to whether Johnson-Sanders, on behalf of MetLife, was conducting her review in a forthright manner. This dispute alone is enough to preclude summary judgment.

MetLife responds that failure to obtain an IME is effectively harmless error because "Dr. Cosgrove's opinions from his report are consistent with Metropolitan's pre-suit evaluation." (Doc. 96 at 6). To begin with, the court is unaware of a harmless error doctrine in Pennsylvania's statutory bad-faith jurisprudence, and MetLife does not point to one. This argument also misconceives our inquiry. We must review the process by which MetLife made its decisions and determine whether they were supported by a reasonable basis. That process need not be "flawless," but it must be thorough enough to provide MetLife with a "reasonable basis" for declining to settle Baum's claim. Whether MetLife had a "reasonable basis" during its investigation is in dispute *because* MetLife did not seek a pre-suit IME. This, coupled with Rappaport's disregarded recommendation that MetLife obtain an IME, is enough clear and convincing evidence to suggest that MetLife's settlement strategy lacked a reasonable basis. That Dr. Cosgrove's post-suit report

confirms MetLife's pre-suit determination does not change whether MetLife acted in bad faith in making that determination.[4]

The parties also debate whether Dr. Cosgrove was improperly biased. We side with MetLife on this point. Bias in selecting a physician to conduct an IME may be relevant to bad faith, but a baseless allegation of bias alone will not suffice. See, e.g., Neal v. State Farm Mut. Auto. Ins. Co., No. 1:13-CV-2309, 2015 WL 2250153, at *4-5 (M.D. Pa. May 12, 2015). Without pointing to any evidence that MetLife chose Dr. Cosgrove because he would offer a biased opinion, or that his opinions were in fact improperly biased, Baum declares: "[I]t is clear that Met Life chose a physician who would not be independent but instead would be biased in his opinions regarding the extent of Ms. Baum's alleged injuries and complaints as well as the cause of same." (Doc. 95 at 12-13). Dr. Cosgrove's prior work for insurance companies does not alone establish unlawful bias or bad faith, and Baum does not cite on-point authority to show otherwise.

In a last-ditch effort to combat Baum's claim, MetLife maintains that an IME is not required because "insurers have been sued for bad faith when they require insureds submit to IME's to obtain benefits." (Doc. 91 at 14 (citing Sayles v. Allstate Ins. Co., 260 F. Supp. 3d 427, 432 (M.D. Pa. 2017)). That may be true in a vacuum, but Sayles arose in a different context: there, the insurer demanded that the

---

[4] We are also mindful that insurers must complete claim investigations "within 30 days after notification of the claim," unless the investigation cannot be completed within that timeframe, in which case they must provide written explanations for the delay every 45 days. 31 PA. CODE § 146.6. The IME is surely part of the claim investigation, and MetLife surely did not complete its investigation within 30 days.

13

insured submit to an IME without seeking leave from the court in violation of Pennsylvania law. Sayles, 260 F. Supp. 3d at 432, 434-38. MetLife did not demand (or request) an IME here. Thus, Sayles is unhelpful.

### 2. *Consideration of Relevant Information*

Baum claims that MetLife "failed to consider" or "ignored" relevant medical information, mainly Dr. Harrington's report, before rejecting her settlement offer. (Doc. 95 at 8-9). MetLife responds that it considered this report but placed "greater reliance on information contemporaneously created as part of Ms. Baum's medical treatment versus the advocacy that was found in the report requested by Ms. Baum's counsel from one of her treating doctors." (Doc. 96 at 5). Whether MetLife adequately considered Baum's complete medical profile is a material issue, and the evidence on this point is in genuine dispute.

Johnson-Sanders testified in her deposition that she considered Dr. Harrington's report but relied more heavily on medical records. (See Johnson-Sanders Dep. 156:10-11, 157:6-158:9). At first blush this sounds reasonable. But Johnson-Sanders is not a medical professional and is not qualified to decide if a treating doctor's narrative is irrelevant to an insured's medical condition. No IME was conducted to place these records in context despite the suggestion of Rappaport—a medical professional. Johnson-Sanders may not have ignored facts *per se*, but it is difficult for an adjuster to favor some evidence (medical records) over others (medical reports) without professional expertise or the findings of an IME. Baum has offered enough evidence that MetLife based its settlement strategy on an incomplete medical picture.

### 3. *Delay*

Baum also contends that MetLife delayed the handling of her claim in bad faith. (Doc. 95 at 13-14). MetLife answers that any delay was justifiably part of the standard claims-handling process and due in part to Baum's complicated injuries. (Doc. 91 at 15-16; Doc. 96 at 6-8). We agree with MetLife on this point.

To show bad-faith delay, the insured must establish "the delay is attributable to the defendant, that the defendant had no reasonable basis for the actions it undertook which resulted in the delay, and that the defendant knew or recklessly disregarded the fact that it had no reasonable basis to deny payment." Thomer v. Allstate Ins. Co., 790 F. Supp. 2d 360, 370 (E.D. Pa. 2011) (quoting Wiedinmyer v. Harleysville Mut. Ins. Co., No. 94–19450, 1999 WL 1324202, at *215 (Pa. Ct. Com. Pl. Aug. 5, 1999)). The process for resolving an insurance claim can be slow and frustrating, see Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 590 (E.D. Pa. 1999), but a long claims-processing period does not constitute bad faith by itself, see Thomer, 790 F. Supp. 2d at 370 (quoting Kosierowski, 51 F. Supp. 2d at 588-89).

We recognize that Baum, not MetLife, caused some of the delay in this case, which leans against a finding of bad faith. Indeed, Baum's decision to wait until April 25, 2016, to file her complaint, when her last contact with MetLife took place on December 11, 2015, proves that MetLife was not the sole impediment to resolving her claim. We also find unconvincing Baum's assertions of delay regarding the transmission of records, (Doc. 91 at 15-16), the period between Dr. Cosgrove's examination and completion of his report, (Doc. 95 at 13), and the various motions filed by MetLife, (Doc. 95 at 13-14).

Baum has not shown that any delay in handling her claim was because of MetLife's bad-faith delay. That its delay does not amount to bad faith, however, does not save MetLife. On balance, we find that Baum has put forth enough clear and convincing evidence to survive summary adjudication on her statutory bad-faith claim.

### B. **Breach of Contract**

MetLife asks us to reject Baum's breach-of-contract claim for two reasons: *first*, Baum's claim is improperly styled as a breach-of-contract claim, when it is in fact a tort claim; and *second*, there has been no breach of the insurance contract because the parties were merely negotiating a settlement and no claim has been denied. We disagree on both accounts.

#### 1. *Law of the Case*

MetLife's first argument—that the breach-of-contract claim is really a tort claim—is foreclosed by the law-of-the-case doctrine. The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Farina v. Nokia Inc., 625 F.3d 97, 117 n.21 (3d Cir. 2010) (citing Arizona v. California, 460 U.S. 605, 618 (1983)). We can revisit an earlier decision in the case when: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier

decision was clearly erroneous and would create manifest injustice." Schneyder v. Smith, 653 F.3d 313, 331-32 (3d Cir. 2011) (quotation omitted).[5]

At the motion to dismiss hearing, Judge Conti rejected MetLife's characterization of this case as a "negligence cause of action … by way of right pursuant to a contract," stating that, at bottom, it "clearly is a breach of contract case." (Doc. 105-19 at 4:20-21, 14:3-5). Judge Conti explained that this case amounts to a dispute about damages allegedly due under the contract, not whether the claim is properly brought under tort law or contract law. (See id. at 6:7-9; see also Erie, 174 A.3d at 587 ("UM claims are grounded in the contractual relationship of the insured and the insurer.")). We find Judge Conti's reasoning to be sound and decline to revisit this issue.

MetLife says we may reconsider a decided legal question because the United States Supreme Court and Third Circuit have done so in the past. (Doc. 96 at 2-4). MetLife cites two inapposite cases in support: Behrens v. Pelletier, 516 U.S. 299 (1996), and Grant v. City of Pittsburgh, 98 F.3d 116 (3d Cir. 1996). Both Behrens and Grant permitted reexamination of immunity questions because, unlike at the

---

[5] MetLife offers several reasons to revisit this question. First, MetLife argues that we should revisit this question because Erie Insurance Exchange v. Bristol, 174 A.3d 578 (Pa. 2017), clarified the "breach" standard in UIM cases. The Erie decision does not change the fact that Baum brought her case as one sounding in contract, not in tort. And second, according to MetLife, Baum's UIM claim is properly viewed as a tort action because Pennsylvania Rule of Civil Procedure 238—which provides for delay damages in tort actions—has been applied in a UIM case by the Pennsylvania Supreme Court. (See Doc. 91 at 19 (citing Touloumes v. E.S.C. Inc., 899 A.2d 343, 349 (Pa. 2006) and Marlette v. State Farm Mut. Auto. Ins. Co., 57 A.3d 1224, 1230 (Pa. 2012))). Both Touloumes and Marlette are distinguishable and do not affect this case; Touloumes was not a UIM case and Marlette involved a suit against the tortfeasor and the insurer.

motion-to-dismiss stage where the complaint alone guides, a plaintiff cannot "rest on the pleadings" at summary judgment. Behrens, 516 U.S. at 309; see also Grant, 98 F.3d at 119-21. MetLife's renewed theory that Baum's claim is one of tort and not contract does not rely on "matters obtained during extensive discovery." Grant, 98 F.3d at 120. Nor does it demand another review of "legally relevant factors … [that] will be different on summary judgment than on an earlier motion to dismiss." Behrens, 516 U.S. at 309. Indeed, MetLife cites virtually no record evidence in its briefing proving that Baum's breach-of-contract claim is now a tort claim.

MetLife's argument instead relies on a purported change in the law effected by Erie, which held that the statute of limitations on UM and UIM claims begins to run after "an alleged breach of the insurance contract, which will be occasioned in this context by a denial of a claim or the refusal to arbitrate." (See Doc. 91 at 18 (quoting Erie, 174 A.3d at 589)). Erie does not change our conclusion *infra* that there is a genuine dispute about whether Baum is legally entitled to benefits under her UIM policy, and it does not change our conclusion *supra* that UIM cases can be properly brought as contract cases. MetLife's "new" arguments merely rehash settled legal issues, and we decline to entertain them again.

### 2. *Breach*

Baum claims that MetLife breached the terms of her UIM insurance policy by failing to pay her what she is "legally entitled to recover" within the policy limits. MetLife insists that there has been no breach. We agree with Baum that, viewing the evidence in her favor, there is a genuine dispute as to breach.

A breach-of-contract claim in Pennsylvania consists of three elements: (1) a contract that includes its essential terms; (2) a breach of that contract; and (3) damages resulting from the breach.[6] Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016). An insurance policy is a contract. Houghton v. Am. Guar. Life Ins. Co., 692 F.2d 289, 291 (3d Cir. 1982). Breach of a UIM policy occurs when the insurer is "alleged to have breached its duty under the insurance contract." Erie, 174 A.3d at 586.

Baum's UIM policy requires MetLife to "pay compensatory damages which an insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle for [bodily injury]" that is "sustained by an insured" and "caused by an accident arising out of owning, maintaining, or the use of an underinsured motor vehicle." (Doc. 102 ¶ 10). Thus, a breach occurs if Baum is "legally entitled" to a payout under the policy and MetLife declines to make the payment. (See Doc. 105-19 at 23:4-24:3, 26:2-21 (Conti, J.)). In other words, if the underinsured motorist caused Baum's injuries, and Baum is legally entitled to funds above those already paid, then MetLife's refusal to settle her claim is a breach. On the other hand, if the January 31, 2014 accident did not cause Baum's injuries and aggravated symptoms, then she is not legally entitled to damages and there is no breach of the insurance policy.

---

[6] MetLife argues that "at no point has Ms. Baum made a request for damages that arise out [of] an alleged breach of the insurance policy that gives rise to Ms. Baum's claim for UIM benefits." (Doc. 96 at 3). That is incorrect. Baum tracks the language of her UIM policy when she requests "*damages legally due* Ms. Baum as a result of the subject motor vehicle collision." (Doc. 9 ¶ 38 (emphasis added)).

19

There is a genuine dispute about whether Baum is legally entitled to coverage under the UIM policy above the $50,000 already covered by State Farm. The parties bitterly dispute whether Baum's injuries resulted from the January 31, 2014 accident or from her preexisting conditions and what Baum's damages figure should be. (See, e.g., Doc. 102 ¶ 20; Doc. 104 ¶ 20). These issues are purely factual and "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. Moreover, because they rest on a determination of damages, these questions are best left to the jury. See Delahanty v. First Pa. Bank, 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983). On the record before us, a reasonable jury could resolve each of these disputes in Baum's favor. We will thus deny MetLife's motion for summary judgment on the breach-of-contract claim.

## IV. Conclusion

At its core, this case turns on factual disputes over whether Baum is "legally entitled" to damages for injuries she claims she suffered after the January 31, 2014 accident and whether those injuries were in fact caused by the accident. These are quintessential issues of fact unsuited for summary adjudication. Thus, we will deny MetLife's motion (Doc. 89) for summary judgment and proceed to trial. An appropriate order shall issue.

    /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    September 26, 2019